JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
ADAM P. SCHLEIFER (Cal. Bar No. 313818)
KEVIN B. REIDY (Cal. Bar No. 320583)
Assistant United States Attorneys
Corporate and Securities Fraud Strike Force/Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4849/8536
     Facsimile: (213) 894-6269
     E-mail:    adam.schleifer@usdoj.gov; kevin.reidy@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:24-cr-295-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S MOTION FOR ORDER PERMITTING REVIEW OF NONPRIVILEGED DOCUMENTS AND FOR ORDER DIRECTING ATTORNEY COMMUNICATIONS BE SUBMITTED FOR *IN CAMERA* REVIEW; DECLARATION OF ADAM P. SCHLEIFER; EXHIBITS |
| v. | |
| ANDREW A. WIEDERHORN WILLIAM J. AMON, REBECCA D. HERSHINGER, and FAT BRANDS INC., | |
| Defendants. | |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Adam P. Schleifer and Kevin B, Reidy, hereby files its Motion for an Order Permitting Review of Nonprivileged Documents or, alternatively, for an order directing in-camera review of certain communications made by counsel to defendant Fat Brands Inc.

    This Motion is based upon the attached memorandum of points and authorities, the attached Declaration of Adam P. Schleifer and the

exhibits thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 7, 2025                    Respectfully submitted,

                                        JOSEPH T. MCNALLY
                                        Acting United States Attorney

                                        LINDSEY GREER DOTSON
                                        Assistant United States Attorney
                                        Chief, Criminal Division

                                        /s/ APS
                                        _____
                                        ADAM P. SCHLEIFER
                                        KEVIN B. REIDY
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

**Contents**

TABLE OF AUTHORITIES...................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I.   INTRODUCTION.......................................................1

II.  STATEMENT OF RELEVANT FACTS AND IDENTIFIED COMMUNICATIONS..........3

    A.   Sussman's March 12, 2020, Email to Outside Auditors..........4

    B.   Sussman's April 24, 2020, Emailed Memo.......................5

    C.   Sussman's Communications Furthered Schemes...................6

III. Argument...........................................................6

    A.   Legal Standards..............................................6

        1.   Attorney-Client Privilege..............................6

        2.   Work-Product Doctrine..................................7

        3.   Crime-Fraud Exception..................................8

        4.   *Zolin* Process........................................8

    B.   Sussman's Email to Outside Auditors Was Never Privileged.....9

    C.   Any Privilege Over Sussman's Email Was Waived...............10

    D.   The Government Has Satisfied Zolin's First Step.............11

IV.  CONCLUSION........................................................13

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                 PAGE

**CASES**

Eastman v. Thompson,
    594 F. Supp. 3d 1156 (C.D. Cal. 2022).................2, 7, 9-10

First Horizon Nat'l Corp. v. Houston Cas. Co.,
    2016 WL 5867268, at *10 (W.D. Tenn. Oct. 5, 2016).............10

In re Grand Jury Investigation,
    810 F.3d 1110 (9th Cir. 2016)................................2,

In Re Grand Jury Proceedings,
    867 F.2d 539 (9th Cir. 1989)..................................8

In re Grand Jury Proceedings,
    87 F.3d 377 (9th Cir. 1996)...................................8

Medinol, Ltd. v. Boston Sci. Corp.,
    214 F.R.D. 113 (S.D.N.Y. 2002).............................2, 11

Middlesex Ret. Sys. v. Quest Software, Inc.,
    2009 WL 10673943, at *6   (C.D. Cal. July 8, 2009)............2

Santander Holdings USA, Inc. & Subsidiaries v. United States,
    2012 WL 3218535, at *1 (D. Mass. Aug. 6, 2012).................9

United States v. Adlman,
    134 F.3d 1194 (2d Cir. 1998)..................................2

United States v. Arthur Young & Co.,
    465 U.S. 805 (1984).........................................11

United States v. Christensen,
    828 F.3d 763 (9th Cir. 2015).....................3, 6, 7, 8, 9

United States v. Friedman,
    445 F.2d 1076 (9th Cir. 1971).................................8

United States v. Hatfield,
    2010 WL 183522, at *3 (E.D.N.Y. Jan. 8, 2010)................11

United States v. Nobles,
    422 U.S. 225 (1975)...........................................7

United States v. Ruehle,
    583 F.3d 600 (9th Cir. 2009)...........................2, 6, 10

United States v. Sanmina Corp.,
    968 F.3d 1107 (9th Cir. 2020).............................11 n.7

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                      <u>PAGE</u>

<u>United States v. Textron Inc. & Subsidiaries</u>,
    577 F.3d 21 (1st Cir. 2009)................................2, 9

<u>United States v. Zolin</u>,
    491 U.S. 554 (1989)......................................passim

**STATUTES**

15 U.S.C. § 78m...............................................5 n.5

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Through lies and material omissions to board members, auditors, minority shareholders, the Securities and Exchange Commission ("SEC"), and the broader investing public, defendant Andrew A. Wiederhorn ("Wiederhorn") caused defendant FAT Brands Inc. ("FAT") to give him $47 million in undisclosed compensation, which Wiederhorn and his codefendants fraudulently categorized as loans from both FAT and its affiliate, Fog Cutter Capital Group Inc. ("FOG"), and upon which Wiederhorn paid no income tax.  (See, e.g., Dkt. No. 1 ("Indictment") ¶¶ 1-2.)

When FAT's outside auditors grew concerned and requested "more details" from FAT's counsel, Allen Sussman, "to support" the fraudulent representations that the funds flowing to Wiederhorn were permissible and that "the loans" from FAT to FOG were not flowing to Wiederhorn "personally," Wiederhorn emailed Sussman, who then emailed FAT's outside auditors the "support" they'd requested.  (Schleifer Decl. Exs. A and B. ("Sussman's Email").)  Some six weeks later, Sussman emailed an additional "Memo to [the] FAT Board," about "the Intercompany Loan" between FAT and FOG ("Sussman's Memo") to which Wiederhorn adverted when he sent a materially misleading "supplement" to that email to FAT's Board.

Sussman's communications turned out to be critical in mollifying FAT's board and its outside auditors, and ultimately permitted Wiederhorn to siphon another $8 million from FAT's coffers. (Schleifer Decl. Ex. C.; see also Indictment ¶¶ 95-102, 128, 130, 132, 134.)  FAT has improperly asserted privileges over both of these critical documents.

Because Sussman's Email was prepared not for any litigative purpose but instead to "support financial filings and gain auditor approval," Sussman's Email was never privileged in the first place. United States v. Textron Inc. & Subsidiaries, 577 F.3d 21, 31–32 (1st Cir. 2009); United States v. Adlman, 134 F.3d 1194, 1203–04 (2d Cir. 1998); see also Eastman v. Thompson, 594 F. Supp. 3d 1156, 1182–84 (C.D. Cal. 2022) (ordering production of documents that "were not made in anticipation of litigation"); cf. United States v. Ruehle, 583 F.3d 600, 609–13 (9th Cir. 2009) (CFO's statements to attorneys failed the "made in confidence" test for attorney-client privilege when made for "the purpose of disclosure to the outside auditors").

Even were Sussman's Email privileged attorney work product[1] when created, however, Sussman's decision to send it to FAT's outside auditor waived any such privilege. Middlesex Ret. Sys. v. Quest Software, Inc., 2009 WL 10673943, at *6 (C.D. Cal. July 8, 2009); see also, e.g., Medinol, Ltd. v. Boston Sci. Corp., 214 F.R.D. 113, 115–17 (S.D.N.Y. 2002).

For all of these reasons, the government requests an order from this Court permitting the government to review Sussman's Email and related work product and communications on the same subject matter.

Alternatively, even were Sussman's Email and Sussman's Memo otherwise privileged, any such privileges would also have been vitiated by the crime-fraud exception. See, e.g., In re Grand Jury Investigation, 810 F.3d 1110, 1113 (9th Cir. 2016). And under the first step of the two-step procedure established by United States v.

---

[1] Defendants have emphasized repeatedly to the government that Sussman's Email was attorney work product but was not an attorney-client communication.

2

Zolin, the government believes it has established a "factual basis adequate to support a good faith belief by a reasonable person that in camera review of [Sussman's Email and Sussman's Memo] may reveal evidence to establish the claim that the crime-fraud exception applies." 491 U.S. 554, 572 (1989); see also United States v. Christensen, 828 F.3d 763, 800 (9th Cir. 2015).

Accordingly, if the Court rules that Sussman's Email is otherwise privileged, the government's prosecution team also requests that the Court agree to review, in a subsequent filing submitted by the privilege-review team, an unredacted version of Sussman's Email to determine whether the crime-fraud exception applies.[2] The government likewise requests an order directing defendant FAT Brands to produce to the Court for in-camera review an unredacted version of Sussman's Memo for the same purpose.[3]

## II. STATEMENT OF RELEVANT FACTS AND IDENTIFIED COMMUNICATIONS

As noted and alleged, and among other schemes and crimes, Wiederhorn caused FAT to compensate him to the tune of roughly $47 million in undisclosed income, which Wiederhorn and his codefendants fraudulently categorized as loans from both FAT and its affiliate, Fog Cutter Capital Group Inc. ("FOG"). (See, e.g., Dkt. No. 1

---

[2] As exemplified by Exhibits A and B to the Schleifer Declaration, there were various email offshoots relating to this topic between FAT's outside auditors, Wiederhorn, Sussman, Hershinger, and others; the government requests that the Court order FAT to produce such offshoots for purposes of the Court's Zolin review.

[3] Whereas FAT's auditors have produced unredacted versions of Sussman's Email to the government, the government does not similarly have an unredacted version of Sussman's Memo. Nor, as noted supra, does the government possess unredacted versions of offshoots of Sussman's Email, although FAT does possess such versions.

("Indictment") ¶¶ 1-2.)[4] By mischaracterizing these illegal distributions as "loans," Wiederhorn was able to mislead the IRS as to his financial picture and avoid preexisting tax debts as well as additional assessments of income tax. (Id. at ¶¶ 35-42, 52-80.)

Although Wiederhorn; FAT's CFO, Rebecca D. Hershinger ("Hershinger"); and FAT itself often retroactively classified distributions to Wiederhorn as "loans" and "intercompany transfers" from FAT to FOG, in reality Wiederhorn often simply caused FAT to pay his credit card and other bills and wire additional funds directly to him. (See, e.g., Indictment ¶¶ 55-66.) As set forth below, those and related transactions eventually drew the scrutiny of FAT's outside auditors, and Wiederhorn's and Hershinger's material misstatements and omissions to FAT's auditors predicate Counts Eighteen through Twenty of the Indictment in this case. (Id. ¶¶ 131-32.)

### A. Sussman's March 12, 2020, Email to Outside Auditors

In February and March 2020, FAT's outside auditors began to scrutinize some of the suspicious transactions constituting the scheme. (Id. ¶¶ 84-92.) In response, Wiederhorn misled them, as evidenced by the first email in the chain containing Sussman's Email, an auditor's March 6, 2020, email to Wiederhorn, which summarized their oral discussion and Wiederhorn's "interpretation" "that the loans are allowable if they are to [FOG] and not you, personally." (Schleifer Decl. Ex. A. at 4.) Given the apparent risks of self-

---

[4] Wiederhorn's scheme in this regard was an outgrowth and continuation of similar conduct he undertook in connection with FOG's predecessors in the 1990s when he took and forgave some $65 million in prior loans, which conduct culminated in his pleas of guilty to two felonies in 2004. (Id. ¶¶ 25-32.)

4

dealing and the fact that "[r]elated party disclosures are a hot button focus issue for the SEC and the PCAOB," however, the auditors requested "more details" and "anything we can get" from FAT's then-outside counsel, Allen Sussman, "in writing to support" Wiederhorn's representations that the funds flowing to him were permissible and that "the loans" were not flowing to him "personally." (See id.)

The next day, Wiederhorn forwarded the auditor's email to Sussman. (Schleifer Decl. Ex. B.) The following week, Sussman emailed the requested analysis directly to FAT's outside auditor, who then forwarded the same to Hershinger.[5] (Schleifer Decl. Ex. A at 1-3.)

**B. Sussman's April 24, 2020, Emailed Memo**

Some six weeks later, on April 24, 2020, Sussman also emailed Wiederhorn a "Memo to the Board," which Wiederhorn forwarded onward to FAT's directors that same day. (Schleifer Decl. Ex. C.) Four days later, on April 28, 2020, Wiederhorn sent FAT's directors an "e-mail to supplement [Sussman's] memo . . . re: the Intercompany Loan." (Id.; see also Indictment ¶ 95.) In that "supplement," Wiederhorn asserted,

> I have navigated the cashflow of both FAT and FOG through these difficult three years carefully keeping in mind the best interests of all FAT shareholders as well as FOG shareholders. It does no good to create a situation where FOG is put at risk with its existing creditors, hence putting the NOL[6] at risk.

---

[5] The email's subject is "SOX 402 Question." In relevant part, Section 402 of the Sarbanes-Oxley Act, 15 U.S.C. § 78m(k)(1), provides, "[i]t shall be unlawful for any issuer . . . directly or indirectly, including through any subsidiary, to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer. Counts Sixteen and Seventeen of the Indictment in this case allege criminal violations of that law.

[6] Net operating losses.

5

1 (Id.)  Wiederhorn also misrepresented, "[f]unds at FOG are used to
2 pay pre-existing pre-IPO liabilities" and enumerated seven specific
3 liabilities with associated monthly payment requirements.  (Id.)
4 Wiederhorn did not disclose, however, that he would route a majority
5 of the funds to be loaned from FAT to FOG to himself, and neither did
6 Hershinger or Sussman, both of whom were copied on this email and
7 attended multiple board meetings at which these matters were
8 otherwise discussed in depth.

    **C.    Sussman's Communications Furthered Schemes**

10     In these ways, the advice sought and given by Sussman in March
11 and April 2020 lie at the center of the frauds and related crimes
12 alleged in the government's case, and likewise predicated and
13 preceded the outflow of an additional $8 million from FAT to
14 Wiederhorn in the fraudulent form of loans in the second, third, and
15 fourth quarters of 2020.  (See Indictment ¶¶ 95-102, 128, 130, 132,
16 134.)

**III. Argument**

    **A.    Legal Standards**

        1.    <u>Attorney-Client Privilege</u>

20     "The attorney-client privilege protects confidential disclosures
21 made by a client to an attorney to obtain legal advice as well as an
22 attorney's advice in response to such disclosures.  The purpose of
23 the attorney-client privilege is to encourage full and frank
24 communication between attorneys and their clients . . . ."
25 Christensen, 828 F.3d. at 802 (cleaned up).  Not all communications
26 involving counsel are privileged, however, and "[b]ecause it impedes
27 full and free discovery of the truth, the attorney-client privilege
28 is strictly construed."  Ruehle, 583 F.3d at 607.  The traditional

6

eight-part test to determine "whether information is covered by the attorney-client privilege" is as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

Id.

### 2. Work-Product Doctrine

The work product doctrine protects from discovery "documents and tangible things prepared by his party or his representative in anticipation of litigation," and "[a]t its core . . . shelters the mental processes of the attorney" so that the attorney "can analyze and prepare his client's case." Christensen, 828 F.3d. at 805 (internal quotation marks and citations omitted).  The "prepared in anticipation of trial" requirement of the work-product doctrine reduces to the question whether "it can fairly be said that the document was created because of anticipated litgation, and would not have been created in substantially similar form but for the prospect of that litigation."  Eastman, 594 F. Supp. 3d at 1182 (internal quotation marks omitted; emphases in original).

Although the work-product doctrine is written into Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, it has long been applied as well to protect the mental processes of attorneys in connection with criminal representation as well.  E.g., United States v. Nobles, 422 U.S. 225, 238 (1975).  That said, "[t]he privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived."  Id. at 239.

7

3. Crime-Fraud Exception

"[W]hen a client consults an attorney for legal assistance to carry out a contemplated or ongoing crime," all "reasons for the [attorney-client] privilege are eviscerated." In Re Grand Jury Proceedings, 867 F.2d 539, 541 (9th Cir. 1989). Put another way, "the attorney-client privilege does not extend to communications between attorney and client where the purpose of that communication is to further . . . illegality." United States v. Friedman, 445 F.2d 1076, 1086 (9th Cir. 1971). That is because "[t]he purpose of the work product privilege is to protect the integrity of the adversary process"; "it does not apply to foster a distortion of the adversary process by protecting illegal" or even unethical actions by an attorney. Id. (internal quotation marks and citations omitted).

As the above holdings suggest, the crime-fraud exception applies equally to documents otherwise privileged as either attorney-client-communications or attorney work-product. See, e.g., Christensen, 828 F.3d. at 802 (analyzing and applying crime-fraud exception to both).

The crime-fraud exception also "applies even when an attorney is unaware that the client is engaged in or planning a crime." In re Grand Jury Investigation, 445 F.3d 266, 279 n.4 (3rd Cir. 2006); see also In re Grand Jury Proceedings, 87 F.3d 377, 382 (9th Cir. 1996) ("It is therefore irrelevant, for purposes of determining whether the communications here were made 'in furtherance of' Corporation's criminal activity, that [counsel] may have been in the dark about the details of that activity.").

4. *Zolin* Process

Zolin established a two-step ex-parte process to evaluate "whether the crime-fraud exception applies to potentially privileged

8

materials." Christensen, 828 F.3d at 799. First, a court must determine whether there is a '"showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.'" Id. (quoting Zolin, 491 at 572). "Second, if the government makes such a preliminary showing based on evidence other than the potentially privileged materials themselves, the court may conduct an in camera review to determine whether the materials are privileged and, if so, whether the crime-fraud exception applies." Id.

**B.   Sussman's Email to Outside Auditors Was Never Privileged**

Sussman's Email was never privileged because it was never created because of anticipated litigation and because it was never confidential.

First, Sussman's Email was never privileged under the work-product doctrine because it was never drafted or sent for any litigative purpose; it was drafted and sent instead to "support financial filings and gain auditor approval." United States v. Textron Inc. & Subsidiaries, 577 F.3d 21, 31–32 (1st Cir. 2009); Santander Holdings USA, Inc. & Subsidiaries v. United States, 2012 WL 3218535, at *1 (D. Mass. Aug. 6, 2012) (tax-reserve work papers not privileged because "they are prepared primarily to fulfill accounting and reporting requirements and not in anticipation of litigation, even though they assess potential litigation"). This Court's holding in Eastman, 594 F.Supp. 3d at 582, is also instructive in this regard. Noting that the work-product doctrine applies a '"because of"' and "but for" test, which asks whether "it can fairly be said that the document was created because of anticipated litigation,"

9

1  Eastman held that many of the documents claimed as privileged in that
2  case were not privileged because they were not created because of
3  anticipated litigation.  Id. at 582-84.  Here, Sussman's Email was
4  not created because of litigation; it was created because FAT's
5  outside auditor requested reassurance that FAT's (fraudulent)
6  transactions were appropriate under SOX 402 and other relevant law.
7       Second, Sussman's Email was never communicated in confidence for
8  purposes of either the work-product doctrine or the attorney-client-
9  privilege, because it was created at the request of FAT's outside
10 auditors and sent to them, for their consumption and analysis, in the
11 first instance.  E.g., Ruehle, 583 F.3d at 607-609 (holding, "Ruehle
12 fails the fourth element of the traditional eight-part privilege
13 test" because "Ruehle's statements to . . . attorneys were not 'made
14 in confidence' but rather for the purpose of disclosure to the
15 outside auditors.")
16      Accordingly, and even before analyzing the question whether any
17 privilege over Sussman's Email was waived through disclosure to the
18 outside auditors or due to its role in a crime-fraud, this Court can
19 and should hold that Sussman's Email was never privileged in the
20 first place.
21      **C.   Any Privilege Over Sussman's Email Was Waived**
22      For similar reasons, even were Sussman's Email privileged in the
23 first instance, the disclosure by Sussman's client, FAT, to its
24 outside auditors would have operated as a waiver.  Numerous courts
25 have held that "disclosure of privileged communications to outside
26 auditors waives both attorney-client privilege and the work-product
27 protection."  E.g., First Horizon Nat'l Corp. v. Houston Cas. Co.,
28 2016 WL 5867268, at *10 (W.D. Tenn. Oct. 5, 2016).  And that is

because, '"[b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility,'" and '"owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust,'" rather than alignment and confidentiality with the client. Medinol, 214 F.R.D at 116 (quoting United States v. Arthur Young & Co., 465 U.S. 805, 817–18 (1984)); see also United States v. Hatfield, 2010 WL 183522, at *3 (E.D.N.Y. Jan. 8, 2010) (disclosure to outside auditors waived work-product protection).[7]

### D. The Government Has Satisfied Zolin's First Step

The non-privileged evidence available to the Court in both email chains containing Sussman's Email and Sussman's Memo suffices to support Zolin's minimal threshold at the first step that there is a "good faith belief by a reasonable person that in camera review of the [privileged] materials may reveal evidence to establish the claim that the crime-fraud exception applies." Zolin, 491 U.S. at 572.

The detailed requests by FAT's outside auditor, which predicated Sussman's response to them, establish a good-faith basis to believe

---

[7] United States v. Sanmina Corp., 968 F.3d 1107, 1122 (9th Cir. 2020), is not to the contrary. Although Sanmina noted that "disclosure of work product to a third party does not waive the protection unless such disclosure is made to an adversary" or "has substantially increased the opportunities for potential adversaries to obtain the information," it held that a client's production of memoranda to its outside law firm for purposes of issuing a valuation report was a waiver of attorney-client communications but was not a waiver of work-product protection before holding also that providing a memo to the IRS referencing those memoranda was a partial waiver of work-product protection. Id. at 1121-26.

11

that review of the substance of Sussman's "may reveal evidence" that Sussman's advice was sought and provided in furtherance of a crime and fraud, whether or not Sussman was a knowing participant in the same. Id.

The same is true regarding Sussman's Memo to FAT's Board one month later. In a misrepresentation critical to his fraud scheme, Wiederhorn specifically described those misrepresentations as a "supplement" to Sussman's "memo to the board re: the Intercompany Loan." (Schleifer Decl. Ex. C at 1.) In other words, Wiedhorn's own words establish a good-faith basis to believe that the substance of Sussman's Memo to FAT's Board "may reveal evidence," that Sussman's advice was sought and given in furtherance of multiple frauds and crimes. Zolin, 491 U.S. at 572.

For these reasons, if the Court believes Sussman's Email is otherwise privileged, the Court should direct that the government's privilege-review team provide an unredacted version of the same to the Court for purposes of its own ex-parte in-camera review under Zolin's second step. The Court should also direct defendants to furnish the Court with unredacted versions of the offshoots of Susman's Email (see, e.g., Schleifer Decl. Ex. B) as well as of Sussman's Memo (id. Ex. C) so that the Court may conduct an in-camera review of the unredacted versions of these communications under Zolin's second step.[8]

---

[8] See Notes 2-3, supra. In addition to the emails exhibited to the Schleifer Declaration, there is, for example, another email from Wiederhorn to Sussman on March 13, 2020, produced in redacted form to the government at FATBRANDS_00459319.

12

**IV. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court hold that Sussman's Email was never privileged or, alternatively, that any such privilege has been waived. Alternatively, the government requests that the Court direct the government's privilege-review team and FAT to furnish the Court with the relevant unredacted versions of Sussman's Email and related communications so that it may conduct an in-camera review of the same.

The government further requests that the Court direct defendant FAT to furnish the Court with an unredacted version of Sussman's Memo so that the Court may conduct an in-camera review of that communication as well.